[Cite as *Brooklyn v. Qasem*, 2025-Ohio-1659.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF BROOKLYN,                    :

    Plaintiff-Appellee,          :

                             No. 114204

    v.                            :

HADDI H. QASEM,                      :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED
**RELEASED AND JOURNALIZED:** May 8, 2025

---

Criminal Appeal from the Parma Municipal Court
Case No. 23CRB02684

---

### *Appearances:*

James J. McDonnell, Prosecutor for City of Brooklyn, *for appellee*.

Anthony & Zomoida, LLC and David S. Anthony, *for appellant*.

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Haddi H. Qasem ("Qasem") appeals his conviction for domestic violence. After reviewing the evidence and relevant case law, we vacate Qasem's conviction and sentence.

## I. Facts and Procedural History

{¶ 2}  On July 25, 2023, Qasem was charged in Parma Municipal Court by the City of Brooklyn with one count of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor, against his oldest son, M.Q.

{¶ 3}  On January 22, 2024, the case proceeded to a bench trial before a magistrate.  The magistrate found Qasem guilty of domestic violence in violation of R.C. 2919.25(A), issued a judgment entry journalizing the guilty finding and referred Qasem to the probation department for a presentence investigation and report.

{¶ 4}  On January 26, 2024, the magistrate issued findings of fact and conclusions of law.  The magistrate found that

(1)  M.Q. and Qasem are family or household members.
(2)  That Qasem caused physical harm to M.Q.
(3)  This conduct occurred in Brooklyn, Ohio.

The magistrate also determined that Qasem failed to prove any affirmative defenses.

{¶ 5}  On February 12, 2024, Qasem filed two objections to the magistrate's decision.  First, the State failed to prove that the offense occurred on July 17, 2023, as charged.  Second, the magistrate's finding that Qasem failed to prove any affirmative defenses was against the manifest weight of the evidence.

{¶ 6}  On March 1, 2024, the trial court overruled Qasem's objections and adopted the recommendation of the magistrate.

{¶ 7}  On April 1, 2024, the magistrate held a sentencing hearing and issued a recommendation on April 2, 2024, in which he stated that, after reviewing the evidence, the presentence report, and the guidelines of R.C. 2929.22, he

recommended the following sentence: "180 days in jail: 177 suspended and three days to be served; $1,000 fine with $750 suspended and 18 months of community control."

{¶ 8} On April 8, 2024, the trial court adopted the magistrate's April 2, 2024 sentencing recommendation in its entirety.

{¶ 9} On May 3, 2024, Qasem filed a motion to stay the judgment, which was granted by the trial court on May 6, 2024.

{¶ 10} Also on May 6, 2024, Qasem filed his first notice of appeal that this court, sua sponte, dismissed for lack of a final, appealable order. *Brooklyn v. Qasem*, 8th Dist. Cuyahoga No. 113899 (May 7, 2024) (motion no. 574277). We found the trial court's judgment merely adopted the magistrate's decision and that, to be a final, appealable order the sentencing entry must have the fact of conviction, the sentence, the clerk's file stamp, and the signature of the judge. We emphasized that the magistrate only has power to recommend the sentence, not impose the sentence.

{¶ 11} On June 5, 2024, Qasem filed a motion to correct the record requesting the trial court issue a final appealable order.

{¶ 12} On June 20, 2024, the trial court issued a judgment entry adopting the magistrate's findings including the conviction, findings of fact and conclusions of law and the sentencing recommendation, found Qasem guilty of domestic violence in violation of R.C. 2929.25(A) and then imposed the sentence previously

given: 180 days in jail: 177 suspended and three days to be served; $1,000 fine with $750 suspended and 18 months of community control.

**{¶ 13}** Qasem filed his notice of appeal of the trial court's June 20, 2024 judgment entry. On appeal, Qasem raises one assignment of error for our review: Qasem's domestic violence conviction is not supported by the manifest weight of evidence.

## II. Trial Testimony

**{¶ 14}** The following testimony was elicited at trial.

### A. Sarah Andrews

**{¶ 15}** Sarah Andrews ("Andrews") is the mother of the ten-year-old child victim, M.Q. Qasem and Andrews married in 2014. Three boys were born of that union including the victim, M.Q. Qasem filed for divorce in June 2021.

**{¶ 16}** Andrews testified that in May 2021, she obtained a protection order after Qasem was arrested for domestic violence. At that time Qasem permanently left the marital home.

**{¶ 17}** As of June 2023, Qasem and Andrews had a court-ordered shared parenting plan for their children. Part of the plan required the children to be exchanged at the Brooklyn Police Station. Andrews would wait with the children inside the station and, when Qasem pulled up, the children would go outside and get into his car. Andrews and Qasem had no contact.

**{¶ 18}** On July 17, 2023, Andrews was with the children at the Brooklyn Police Station and, after the children left with Qasem, she went home and started to

receive distressing phone calls from all three children using Qasem's phone and with Qasem heard in the background. Andrews heard Qasem "yelling, calling my son a liar" and telling Andrews she needs to parent the children and fix the problems he is having with them at his house. She heard swearing and name calling and "a lot of yelling" from the children as well as Qasem. Everybody was crying and screaming. It was "just chaos." Andrews was worried about the boys after five or six calls. She then began recording the calls but did not call the police, nor did she go to Qasem's house, because of a protective order and "for [her] own safety [she] won't go there."

{¶ 19} On July 18, 2023, Andrews received more phone calls in the morning from their middle child.

{¶ 20} Andrews, unsure what to do, reached out to professionals in the domestic relations court asking for help and provided some of the recordings she had made.

{¶ 21} On July 19, 2023, Andrews waited at the Brooklyn Police Station for the boys to be brought there by Qasem. According to Andrews, all three boys rushed into the lobby after Qasem made the exchange. They were all crying but M.Q. was crying the hardest. M.Q. was visibly upset, hyperventilating and panicking and "he couldn't even talk." The other boys were trying to explain what happened.

{¶ 22} On the way home, M.Q. began telling her what happened and, at that time, she saw "the visible injury." M.Q. told her that Qasem had bit him in the face, pulled his hair, grabbed him by the back of his neck, punched him in his leg and "smacked" him.

{¶ 23} Upon arriving home, Andrews noticed that M.Q. had urinated in his pants and defecated himself.

{¶ 24} Andrews did a full body examination of M.Q. when they got home. She noted that there were black-and-blue, raised, welted fingerprints on M.Q.'s "right butt cheek" and an oval shaped mark on his left cheek with scratching on the cheek as well. Andrews photographed both areas that day.

{¶ 25} After seeing and photographing these marks on M.Q.'s body, Andrews called Brooklyn police who advised her to take her child to Fairview Hospital's pediatric emergency room where M.Q. was interviewed by a sexual assault nurse examiner ("SANE nurse").

{¶ 26} The following day, Andrews went to the Brooklyn Police Station and gave a written statement.

{¶ 27} On cross-examination, Andrews testified that when Qasem was arrested for domestic violence in May 2021, she was the victim and that case was dismissed or Qasem was found not guilty. At the time of trial, the protection order she had was expired, but it was not expired at the time of the incident. The children, however, currently have a protection order against Qasem issued by the Parma Municipal Court.

{¶ 28} According to Andrews, the children called her on July 17, 2023, within the first few hours of the children being with Qasem. She could hear everyone yelling and heard her oldest son yell at Qasem. She also heard Qasem screaming at M.Q. to respect him. During the conversation she heard M.Q. threaten to urinate on

Qasem's pillow. Andrews agreed her son was being disrespectful to Qasem. All of this transpired before M.Q. was allegedly bitten or hit.

{¶ 29} In the police report Andrews stated that she had a recorded phone call from July 17, 2023, during which Qasem can be heard screaming and berating her and M.Q. Andrews received over ten phone calls on July 17, 2023, from her children while they were with Qasem. No one indicated M.Q. had been physically harmed during these phone calls.

{¶ 30} When she was at the police station with her children after they were brought there by Qasem, M.Q. was crying so hard she did not immediately notice the red marks on his face but she did notice them in the car.

{¶ 31} Andrews testified that there have been at least ten reports made to various police agencies from 2021 to present. Qasem was charged in one incident when she was the named alleged victim. These incidents have also been reported to the Cuyahoga County Department of Children and Family Services, including the incident this case concerns.

{¶ 32} At Fairview Hospital, Andrews had a conversation with the SANE nurse who asked for permission to photograph M.Q. Although photographs were allegedly taken, there were none included in M.Q.'s medical records nor were they otherwise introduced as evidence at trial.

{¶ 33} Andrews conveyed to the SANE nurse what the boys had told her such as that their father was smashing things like their Nintendo Switch during their visit. She also informed the SANE nurse that Qasem had previously abused her and

reported that there was a current custody battle. She told the SANE nurse that she received a lot of phone calls from her children while in Qasem's care because of him being physically and verbally abusive.

{¶ 34} The medical records indicate that "Mother state[d] that [M.Q.] had called her on the phone multiple times. Called her multiple times while in father's care due to father being abusive physically and verbally." Andrews also informed the SANE nurse that M.Q. holds his stool while at Qasem's house and came home incontinent of both urine and stool, which is abnormal for him. Andrews regarded such behavior as atypical for a boy his age.

{¶ 35} Andrews testified that M.Q. has anxiety and he is going to counseling.

{¶ 36} Andrews agreed that M.Q. and Qasem clash and argue quite a bit. Andrews did not photograph M.Q.'s lower extremities because it was summer and her children get bruises on their legs from anything so she did not think it was necessary.

{¶ 37} Before this incident, Qasem's visits with his children were supervised. Then, in the spring 2023, he started having visits without supervision. The children had several prior unsupervised visits with Qasem before this incident.

**B. M.Q.**

{¶ 38} M.Q. took the stand and identified his father, Qasem, in court. M.Q. is currently in fifth grade. He has not had a visit with Qasem since this incident. M.Q. testified that the last time he was at Qasem's house Qasem "would spank me and then grab my butt and rip it open [once or twice] . . . he bit me on the cheek."

{¶ 39} When M.Q. was taken by Andrews after the last visit, he was crying because he had such a horrible time with Qasem. Andrews took photographs of him when they got home. M.Q. identified State's exhibit No. 2 as a photograph of his buttock with three bruises on it that were caused by Qasem. M.Q. identified State's exhibit No. 1 as a photograph of him with a lot of marks on his cheek caused by Qasem when he allegedly bit M.Q.

{¶ 40} M.Q. recalled going to Fairview Hospital a few days after the incident where he talked with a nurse about what happened. He also talked with the police about what happened.

{¶ 41} Under cross-examination, M.Q. testified that he recalled telling Qasem he was going "to [urinate]" on Qasem's pillow during the last visit and that there was a disagreement over his Nintendo Switch between him and his younger brother. M.Q. did not want his younger brother to use it. Qasem got very upset about this and broke the Nintendo Switch. This occurred on the last day the children were with Qasem. This was the same day M.Q. was spanked and allegedly bitten by Qasem. M.Q. testified that Qasem bit him with his lips over his teeth.

{¶ 42} M.Q. recalled the phone call with Andrews while he and his brothers were with Qasem. During the phone call M.Q. and Qasem were yelling at each other. M.Q. admitted that there were times that he hit, kicked and spit on Qasem and also kicked him in "the privates." M.Q. further admitted that this was inappropriate behavior towards Qasem.

{¶ 43} M.Q. recalled going to work with Qasem and, during his visit, to one of the bars Qasem sells tickets to. While at the bar, M.Q. remembered calling the woman who ran the bar nasty names.

{¶ 44} During the visit with Qasem, M.Q. also recalled his relative, Lisa Spaci ("Spaci"), coming to the home on one of the days.

{¶ 45} On redirect examination, M.Q. clarified that he only kicked and spit on Qasem when Qasem was scaring him, hurting him or threatening him. Qasem would always do something first and M.Q. then reacted. M.Q. kicked Qasem in the groin because Qasem was scaring him. M.Q. was defending himself.

**C. Barbara Soha**

{¶ 46} Barbara Soha ("Soha") runs a bar in which Qasem has equipment and he comes into the bar to take care of the equipment and empty the change from the machine.

{¶ 47} On July 18, 2023, Qasem came to her business at approximately 10:30 a.m. Qasem's two youngest children came into the bar with him and Soha was told the oldest one, M.Q., was in the car. Soha went to the door and told M.Q. to come in because she gives the children pop or chips when they come in. M.Q. did not want to come inside. Soha testified that M.Q. said, "f*** you, b****."

{¶ 48} While Soha got snacks for the youngest boys, Qasem went outside to talk to M.Q. who eventually came into the bar. M.Q. started talking to Soha saying "this is a poor establishment, this is a bad investment you have here, nobody's ever going to come in here." Qasem then took M.Q. back outside to sit in the car.

**{¶ 49}** M.Q. was seated in the back behind Qasem and, as they were leaving, Soha saw M.Q. physically "attacking and hitting" Qasem from the backseat. Because the windows were down, she could hear M.Q. yelling "b****, f*** you" at Qasem as they left.

### D. Lisa Spaci

**{¶ 50}** Spaci testified that Qasem is related to her children's father, she has known Qasem for about 20 years and she knows his children. Spaci recalled July 18, 2023, because Qasem was at work with his boys and called her from his car. Qasem asked if Spaci wanted to get lunch together with his boys. Spaci agreed to meet them. While on the phone with Qasem, Spaci heard M.Q. screaming, yelling and cursing and he called Spaci a "f****** b****." Qasem had to call her back several times and eventually told her to meet them at his house.

**{¶ 51}** Spaci arrived at Qasem's home and walked in. According to Spaci, M.Q. "was out of control and screaming and yelling at his dad saying that he was made by the devil. He tried to get his mom killed . . . I hate you." According to Spaci, "[M.Q.] was out of control, he spit on [Qasem], he punched [Qasem], he kicked [Qasem]." She testified further that

> At that point [Qasem] couldn't control [M.Q.]. [Qasem] grabbed [M.Q.'s] arm, tried to get [M.Q.] to put him in the room. He couldn't, [M.Q.] wouldn't walk with [Qasem] so [Qasem] grabbed [M.Q.], pulled [M.Q.] up, put [M.Q.] on top of the bed, pulled [M.Q.'s] pants down, and spanked [M.Q.] a few times.

Spaci was in the hallway when this happened and was able to observe the altercation. Spaci then left the home.

{¶ 52} Spaci testified that she has seen M.Q. act this way before on numerous occasions. Spaci stated that

> [Qasem has] always been good with his kids. He's always tried to calm them down, put them in the room, maybe take his, their toys away. He's always tried to talk them through everything. He's a great dad, you know. I've always admired that about him. I mean before this, I mean before, when the kids, before they started the divorce, you know, they were fine, they were great kids. They've only gotten worse and worse and out of control. And this is just the last two years. They've changed. It just doesn't seem like the same kids.

This was the first time she had seen Qasem spank his child. Qasem seemed distraught to Spaci as he kept telling M.Q. to calm down and stop it, but Qasem could not control him. M.Q. reacted to Qasem's words by going "crazy," kicking him, spitting on him, punching him and telling him he hates him.

{¶ 53} Under cross-examination, Spaci testified that it would not be appropriate for Qasem to destroy his children's Nintendo Switch or to hit his children so hard that a child got bruises on his buttock.

**E. Haddi Qasem**

{¶ 54} Qasem testified that at the time of the incident in question, M.Q. was ten years old. Qasem stated definitively that he did not bite M.Q. or pull his hair, nor did he punch M.Q. in the legs, but he did admit to spanking M.Q.'s "butt" once on July 18 and once on July 19, 2023.

{¶ 55} On July 18, 2023, after breakfast, Qasem took his children to Soha's bar. While there, M.Q. was very disrespectful to Soha saying "f*** you, b****" and telling her that she was a bad investment. M.Q. said many disrespectful,

inappropriate and outrageous things to Soha but Qasem was not able to remember them all. Because of his inappropriate behavior, Qasem left M.Q. in his car and took the other two children inside. M.Q. eventually came in and started calling Soha "a b****, saying f*** you." Qasem took M.Q. back to the car so Qasem could finish his business in the bar. M.Q. was saying inappropriate things from the car such as "[w]hen are you going to pay mom's child support you f****** loser[,]" and "[y]ou were made by [] the devil."

{¶ 56} When Qasem got into the car M.Q. began punching him. M.Q. then jumped over the seat and attacked Qasem. M.Q. punched Qasem several times in the face while Qasem was driving. Qasem had to pull over and get M.Q. to sit in his seat to make him stop. To do so, Qasem spanked his son once in the car on the way home.

{¶ 57} When they got home Spaci was going to meet them for lunch and M.Q. did not stop his behavior. Qasem believed M.Q. had so much poison and hatred towards him. After these incidents, M.Q. would usually hug Qasem, say how sorry he was and say that he does not know why he acted in that manner.

{¶ 58} Qasem testified that M.Q. had heard too many adult things from Andrews, like when she said Qasem tried to have her killed. Andrews has called the police 68 times as well as child protective services in five different police jurisdictions. She has been on the front page of the paper because she has filed so many police reports.

{¶ 59} The second time he spanked M.Q. was on July 19 2023, when M.Q. refused to let his younger brother play with a Nintendo Switch. Qasem went to grab the Switch from M.Q. They wrestled over it and they ended up snapping it. Qasem was very upset at this point and threw the then broken Switch on the ground. Qasem was upset because he had spent $400 on it as a Christmas present for M.Q. Prior to breaking the Switch, M.Q. had thrown his younger brother into Qasem's television and broke it so Qasem was already upset. Qasem had to put M.Q. in his room to calm down. M.Q. spit on his one brother and kicked the other brother in the face, and his brother "flew across the room." Qasem testified that "[M.Q.] tells [his brothers] you love them more than you love me so I'm going to abuse them." M.Q. also said that "me and mommy are going to make sure that . . . you're nothing but a memory to [his younger brothers]."

{¶ 60} After this incident Qasem took the children back to Andrews. M.Q. was crying because he was upset about the Switch. M.Q. "was going off, he said you're going to pay for breaking my Switch . . . watch what me and mommy do to you."

{¶ 61} Qasem has not spent time with M.Q. since July 2023. He has seen M.Q. when picking up the other children from Andrews and when he does, M.Q. has given Qasem the middle finger and said, "f*** you."

{¶ 62} M.Q. started having these issues right after the divorce proceedings commenced in June or July 2021. Qasem has tried to address these behavioral issues with M.Q. Qasem has tried several times to talk with M.Q. and M.Q. spit on

him multiple times and kicked Qasem in the groin multiple times. Qasem has tried to have other adults talk with M.Q. as well, with no success.

{¶ 63} Qasem has sought professional help to deal with M.Q. M.Q. was sent to Changes, a program for poorly behaved children. Dr. Davis has been involved with M.Q. At one time, M.Q.'s guardian ad litem ("GAL") set up an appointment with Qasem's therapist and "right when we walked into the appointment [M.Q.] looked at me, he looked at [the therapist] and said mommy says I don't have to listen to your crazy doctor." Qasem has not arranged for counseling for M.Q. because Andrews does not allow Qasem to be involved in the process. Qasem believed that M.Q. is participating in counseling now.

{¶ 64} Qasem has tried noncorporal punishments with M.Q. such as taking away his Switch for a full day. He described a time when they were at a recreation center and one of the lifeguards told M.Q. he could not swim in a certain area and M.Q. started yelling at the lifeguard and "did a throat slashing gesture" to the lifeguard. Qasem did not let M.Q. swim for the rest of the day. M.Q.'s recreation center membership was revoked for that behavior.

{¶ 65} M.Q. threatened to urinate on Qasem's pillow several times. Qasem believed he got that idea from Andrews, whom he claims has actually done that to him.

{¶ 66} On cross-examination, Qasem admitted to spanking M.Q. and causing bruises. The spanking was for M.Q.'s poor behavior. Qasem denied causing marks on M.Q.'s face. Qasem testified that the marks on M.Q.'s face came from M.Q.

rubbing his face on Qasem's beard while he was driving which nearly caused an accident. Despite the problems M.Q. caused, Qasem wants M.Q. to visit because M.Q. is his son and he loves him.

### III. Law and Analysis

{¶ 67} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). In our manifest-weight review of a bench trial verdict, we recognize that the trial court is serving as the factfinder and not a jury:

> Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*State v. Bell*, 2019-Ohio-340, ¶ 41 (8th Dist.), citing *State v. Strickland*, 2009-Ohio-3906, ¶ 25 (8th Dist.). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *State v. Crenshaw*, 2020-Ohio-4922, ¶ 24 (8th Dist.).

{¶ 68} Qasem argues that this is one such exceptional case and that his actions towards his son were reasonable and proper. We agree.

{¶ 69} R.C. 2919.25(A), the statute for domestic violence at issue in this case, provides that "[n]o person shall knowingly cause or attempt to cause physical harm

to a family or household member." *See also Crenshaw* at ¶ 19. "Physical harm to persons" pursuant to R.C. 2901.01(A)(3) is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 70} Proper and reasonable parental discipline can be an affirmative defense to a charge of domestic violence. *Crenshaw* at ¶ 26, citing *Westlake v. Y.O.*, 2019-Ohio-2432, ¶ 23 (8th Dist.), citing *State v. Hart*, 110 Ohio App.3d 250, 254 (3d Dist. 1996).

{¶ 71} In *State v. Suchomski*, 58 Ohio St.3d 74 (1991), the Ohio Supreme Court found that prosecution under R.C. 2919.25(A) for domestic violence does not interfere with a parent's right to administer corporal punishment. The court stated:

> Nothing in R.C. 2919.25(A) prevents a parent from properly disciplining his or her child. The only prohibition is that a parent may not cause "physical harm" as that term is defined in R.C. 2901.01[(A)(3)].
>
> * * *
>
> A child does not have any legally protected interest which is invaded by proper and reasonable parental discipline.

*Suchomski* at 75. Pursuant to *Suchomski*, a parent may use corporal punishment as a method of discipline without violating R.C. 2919.25(A) as long as the discipline is proper and reasonable under the circumstances. *Y.O.* at ¶ 24, citing *State v. Hicks*, 88 Ohio App.3d 515, 518 (10th Dist. 1993). "Proper" and "reasonable" have been respectively defined as "suitable or appropriate" and "not extreme or excessive." *Id.*

{¶ 72} "The propriety and reasonableness of corporal punishment in each case must be judged in light of the totality of the circumstances. A child's age,

behavior, and response to noncorporal punishment as well as the location and severity of the punishment are factors that should be examined." *Crenshaw*, 2020-Ohio-4922, at ¶ 30, quoting *Hart* at 256.

{¶ 73} We find that, after reviewing the propriety and reasonableness of Qasem's corporal punishment of M.Q. in light of the totality of the circumstances, Qasem's actions constitute reasonable parental discipline.

{¶ 74} Applying the applicable factors from *Crenshaw*: M.Q. was ten years old at the time of the incident. Testimony established that M.Q.'s behavior during his time with his father was atrocious. Testimony established that M.Q. was swearing profusely and was punching, kicking, spitting on, threatening and physically attacking Qasem and M.Q.'s younger siblings. Qasem testified that he attempted noncorporal punishment by telling M.Q. to calm down and stop, putting M.Q. in his room and trying to take away M.Q.'s Nintendo Switch privileges, which resulted in the console being broken, angering M.Q. further. The location of the punishment is M.Q.'s buttocks, which is an appropriate location for discipline spanking. Lastly, being spanked after terrible behavior is a low level of severity and is not extreme or excessive. The punishment was proper and reasonable under the circumstances. *Y.O.*, 2019-Ohio-2432, at ¶ 24, citing *Hicks*, 88 Ohio App.3d at 518.

{¶ 75} We find, in light of the totality of the circumstances, that Qasem engaged in reasonable parental discipline when he spanked M.Q.[1] As such, we find

---

[1] We note M.Q. testified that Qasem bit him and pulled his hair; however, the criminal complaint states that Qasem "struck his 10-year-old son [M.Q.] multiple times in

that Qasem's conviction for domestic violence is against the manifest weight of the evidence since the evidence supports that Qasem's actions constituted reasonable parental discipline.

{¶ 76} Qasem's assignment of error is sustained, and his conviction is vacated.

It is ordered that appellant recover from appellee costs herein taxed

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Parma Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EMANUELLA D. GROVES, J., CONCURS;
EILEEN T. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION)

EILEEN T. GALLAGHER, J., DISSENTING:

{¶ 77} I respectfully dissent from the majority's resolution of this case. I recognize that proper and reasonable parental discipline can be an affirmative defense to a charge of domestic violence. In *State v. Suchomski*, 58 Ohio St.3d 74, 75 (1991), the Ohio Supreme Court held that nothing in R.C. 2919.25, the domestic

_____

different areas on his body and caused injury on his person." Therefore, we focus our analysis only on Qasem's striking M.Q., i.e., when Qasem spanked M.Q.

violence statute, prevents a parent from properly disciplining his or her child. "The only prohibition is that a parent may not cause 'physical harm' as that term is defined in [former] R.C. 2901.01(C)." *Id.*

{¶ 78} R.C. 2901.01 defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." In *State v. Webb*, 2025-Ohio-456, ¶ 19 (8th Dist.), we recently held "'[t]here is no requirement that pain must be demonstrated by an outward physical manifestation in order to constitute physical harm.'" *Id.*, quoting *State v. Barnes*, 2006-Ohio-5239, ¶ 17 (8th Dist.); *State v. Perkins*, 1998 Ohio App. LEXIS 1213, *6 (11th Dist. Mar. 27, 1998) (Any act, even a slap that invokes a grimace, can constitute physical harm.). "''[W]hen there is no tangible, physical injury such as a bruise or cut, it becomes the province of the [trier of fact] to determine whether, under the circumstances, the victim was physically injured, after reviewing all of the evidence surrounding the event.'''" *Id.* at ¶ 19, quoting *Barnes* at ¶ 17, quoting *Perkins* at *7.

{¶ 79} Pursuant to *Suchomski*, a parent may use corporal punishment to discipline a child, but the parent may not cause physical harm to the child. *Suchomski* at 75. Qasem admitted that he spanked M.Q. and that he caused bruising to his buttocks. (Tr. 80.) A photograph of M.Q.'s buttocks was admitted into evidence as State's exhibit No. 2, depicting the bruises, a tangible injury.

{¶ 80} It is clear that Qasem loves M.Q. It is also true that M.Q. was angry, unruly, and disrespectful to Qasem throughout the entire weekend visit. The trial testimony presents a cautionary tale of how the negative words and actions of

divorcing parents can cause lasting emotional harm to their child, the very child they want to protect. It seems that M.Q was exposed to this kind of negative behavior from both sides and that he was misbehaving as a result.

{¶ 81} I believe Qasem was merely trying to pacify M.Q., but he used excessive force. A parent may spank his child, but he may not injure him. When a parent injures his child, he is guilty of domestic violence. Because Qasem admits that he caused the bruises, the trial court's judgment finding him guilty of domestic violence is supported by the manifest weight of the evidence. For these reasons, I respectfully dissent and would affirm the trial court's judgment.